U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2011 AUG 31  PM 2: 44

CLERK
BY_____ PM
DEPUTY CLERK

REVISION MILITARY, INC., and           )
REVISION MILITARY, LTD.,               )
                                       )
        Plaintiffs,                    )
                                       )
    v.                                 )   Case No. 5:11-cv-149
                                       )
BALBOA MANUFACTURING COMPANY,          )
d/b/a BOBSTER EYEWEAR,                 )
                                       )
        Defendant.                     )

**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS
AND TRANFSER VENUE AND DENYING PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**
(Docs. 2, 11)

This matter came before the court on July 20, 2011 for an evidentiary hearing on the motion for a preliminary injunction (Doc. 2) filed by Plaintiffs Revision Military, Inc. and Revision Military, Ltd. (collectively, "Revision").  Also before the court is the Defendant Balboa Manufacturing Company's d/b/a Bobster Eyewear ("Balboa") motion to dismiss for lack of personal jurisdiction and improper venue, or in the alternative, motion to transfer venue (Doc. 11).

Revision and Balboa both manufacture protective eyewear.  Revision alleges that Balboa's "Bravo" goggles infringe Revision's U.S. design patents D537,098 (the "'098 patent") and D620,039 (the "'039 patent"), which are manufactured and marketed as two versions of Revision's "Bullet Ant" goggles.  Revision asks the court to enjoin Balboa from marketing or selling products that infringe upon the '098 and '039 patents, including, but not limited to, the allegedly infringing Bravo goggles, until a final decision on the merits is reached with regard to Revision's patent infringement claims.

Balboa denies infringement and contends that it is not subject to, and does not consent to, this court's personal jurisdiction.  In the alternative, Balboa seeks a transfer of venue to the Southern District of California.

For the reasons set forth below, Balboa's motions to dismiss and to transfer venue are DENIED, and Revision's motion for a preliminary injunction is DENIED.

I.     **Findings of Fact**.

By agreement of the parties, the record before the court includes not only the testimony and exhibits introduced at the court's evidentiary hearing, but also the declarations filed by the parties.  Revision's declarations consist of a declaration by Vice President of Product, John Fowler, and a declaration by its Senior Legal Coordinator Michelle Rochette.  Balboa's declarations consist of a declaration by Jennifer Struebing, a vice president and managing member of Balboa, Patrick P. Hussey, a consultant in the specialty eyewear business, and Donn K. Harms, Esq., a patent attorney.  Based upon this record, the court makes the following factual findings.

A.     **Jurisdictional Facts.**

Revision Military, Inc. is a Canadian corporation with its principal place of business in Montreal, Quebec, Canada.  Revision Military, Ltd., the manufacturing and marketing subsidiary of Revision Military, Inc., is a Delaware corporation with its principal place of business in Essex Junction, Vermont.  In Vermont, Revision Military, Ltd. assembles and manufactures Revision products (including the Bullet Ant goggles), and is responsible for the marketing and sales of all Revision products in the United States.

Balboa is a limited liability company with its principal place of business in Poway, California.  Balboa does not have any real property, employees, sales staff, or offices in Vermont.  It is not registered to do business in Vermont, has no registered agent to accept service within the state, and does not advertise in Vermont-based publications.

Balboa operates primarily on a business-to-business model, selling its products either to retailers, or to independent distributors who then distribute the products to

2

various dealers.  None of the independent distributors or retailers to whom Balboa directly sells its products is located in Vermont.

Balboa uses independent distributors as its primary channel of distribution with the expectation that they will resell Balboa products in the United States.  As part of this stream of distribution, Balboa's products are available for purchase in Vermont through a number of independent dealers who purchase Balboa products from Balboa's independent distributors.  Any dealer located in Vermont who carries Balboa products can "special order" a Balboa product for a Vermont customer, including the allegedly infringing Bravo goggles.  Balboa reported "Total Vermont non-Website Sales 2009-2011" in the amount of $650.47 representing approximately fifty-six products.  It is assumed that these represent "special order" sales, however, Balboa's evidence does not make that point clear.

In addition to its wholesale business, Balboa maintains an interactive website that displays product, advertising, and pricing information, and through which anyone in the United States, including Vermonters, can purchase the allegedly infringing Bravo goggles and other Balboa products. [1] On July 12, 2011, Balboa's website contained a photograph of the allegedly infringing Bravo goggles as a "Featured Product" on its Ballistics/Tactical page.  The photograph is of a man in a camouflage uniform and other military gear wearing the allegedly infringing Bravo goggles.  The website described the allegedly infringing Bravo goggles, their price, and a means for ordering them.  Shipping, handling, and sales tax are calculated by Balboa's website based upon the destination of the product.

On July 13, 2011, Revision's representative, Michelle Rochette, completed an online purchase of the allegedly infringing Bravo goggles for $89.98 with anticipated

---

[1] After Revision filed its Complaint in this case, and at the direction of counsel, Balboa discontinued its offer to sell the allegedly infringing Bravo goggles through its website to Vermont residents.  For purposes of personal jurisdiction, however, the court assesses Balboa's Vermont contacts as of the filing of the complaint. *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991).

delivery in Vermont between July 15-18, 2011. Although she received confirmation that the Bravo goggles would be shipped, she had not yet received delivery at the time of the court's evidentiary hearing.

In addition to direct sales, Balboa's website provides links to websites maintained by independent distributors and a "Dealer Locator" link. This link takes the user to a page that identifies "dealers who purchase Bobster products through our distributors." The user may insert either a zip code or the name of a state to identify these dealers. The website states: "We highly recommend contacting dealers listed prior to visiting the location to ensure product availability. Not all dealers carry the full Bobster line, however, every Bobster dealer can special order any product that you want." By following the links on Balboa's website, twenty-seven different dealers in Vermont are identified by name and location.

Balboa's website also advises prospective dealers to contact Balboa to be added to the dealer location list. In order to achieve this designation, a dealer must buy its products directly from Balboa.

In preparation for this lawsuit, Ms. Rochette visited two Vermont dealers identified through links on Balboa's website. Both dealers confirmed that they carry Balboa products although one was out of stock. Both dealers also confirmed that they could order Balboa products. One dealer maintained a display case containing Balboa goggles. The allegedly infringing goggles, however, were neither on display nor present in the dealer's store.

During the years 2009-2011, Balboa made approximately forty-three online sales to Vermont residents. During the 2009-2011 time period, Balboa sold approximately ninety-nine products directly to Vermont residents for total sales in the amount of approximately $1,700. For the past twelve months, Balboa's direct sales to Vermont customers represented .003% of its total sales. Balboa acknowledges that these numbers do not include Balboa products purchased in Vermont through dealers carrying Balboa products. It agrees that "the number of products and the volume of products sold to

Vermont residents exceeds the number that [Balboa reported as direct sales]." (7/20/11 Hearing Tr. at 14).

**B.    Revision's Allegations of Infringement.**

Collectively, Revision is an eyewear manufacturing company that designs, manufactures, and sells stylized eyewear products. It has been actively producing and selling "ballistic" protective eyewear since 2003. Approximately ninety-five percent of its ballistic eyewear sales are made to militaries around the world through open bid military contracts. The remaining five percent of product sales are made to professional law enforcement through government contracts, and to individual consumers who require eye protection, such as hunters and range shooters, through Revision's website and third-party retailers.

Revision invests significant resources into the research and development of its products, and it regularly obtains patent protection for its product designs. Through this practice, as well as through advertising and trade show presentations, Revision claims to have a reputation as an innovator in ballistic protective eyewear.

Revision products undergo testing for quality assurance. Revision maintains its own certified lab that verifies compliance with the U.S. military's impact requirements for protective eyewear. Additional testing includes environmental tests to assure product performance when exposed to sand, fog, extreme heat or cold, or certain chemicals.

In September 2005, Revision introduced goggles under the name "Bullet Ant." Revision developed the Bullet Ant goggles for military, tactical, and SWAT operations. The product exceeds military ballistic impact requirements. On February 20, 2007, the '098 patent was issued with regard to the first generation Bullet Ant goggles. On July 20, 2010, Revision was issued the '039 patent for a "second generation" Bullet Ant goggles design, and thereafter discontinued production of the original Bullet Ant. Presently, only the second generation design is sold under the Bullet Ant name. Revision Military, Inc. owns each patent, and Revision Military, Ltd. is the exclusive licensee of each patent.

The '098 patent describes goggles depicted in six drawings which are attached to this Opinion and Order as Exhibit A. The '039 patent describes goggles depicted in the

5

six drawings which are attached to this Opinion and Order as Exhibit B.  The court's visual inspection of the first (Exhibit 3) and second (Exhibit 5) generation Bullet Ant goggles confirms Revision's claim that the actual goggles are substantially the same as the designs claimed in the '098 and '039 patents.

Revision identifies a combat soldier who needs ballistic protection as the ordinary purchaser of both generations of its Bullet Ant goggles.  When sold with a three-lens kit, Revision's suggested retail price for its second generation Bullet Ant goggles is $129.00.

Revision claims that Balboa's Bravo goggles infringe both the '098 and '039 patents.  It asserts that the similarity of the Bravo and Bullet Ant goggles is such that the Bravo goggles may be mistaken for the Bullet Ant goggles and thus, "if unmatched in quality, jeopardizes Revisions goodwill based upon product quality." (Doc. 2 at 7.)  In addition, Revision alleges that by selling the Bravo goggles at a lower price, Balboa "threatens Revision with price erosion."  *Id.*   Finally, Revision alleges that by marketing the Bravo goggles as military tactical eyewear, Balboa is promoting its product to Revision's customers and "threatens to compete directly with Revision in the military contract market." *Id.* at 8.  Revision asserts that it will suffer irreparable harm that is not compensable by monetary damages if a preliminary injunction is not issued.

### C. Balboa's Evidence Related to Infringement.

In approximately 1997, Balboa entered the protective eyewear market under the brand name Bobster Eyewear.  At the time, Balboa sold its line of protective sunglasses and goggles primarily to motorcycle riders.

In 1999, Balboa made its first sale of goggles to the U.S. military.  In 2010, the allegedly infringing Bravo goggles were first offered for sale.  Balboa was aware of Revision's Bullet Ant goggles when it designed its Bravo goggles.

The Bravo goggles represent Balboa's first product to meet the U.S. military's ballistic protective eyewear impact requirements.  Balboa utilizes third-party testing to verify compliance with military specifications.  To date, Balboa has not entered into any contracts with a military service or department of defense for ballistic eyewear, and has not submitted a bid to do so to any such entity or to any law enforcement organization.

6

When offered with a three-lens kit, the suggested retail price of Balboa's Bravo goggles is $89.98.

Balboa denies that the design of its Bravo goggles is substantially similar to the '098 or '039 patents, and further claims that its Bravo goggles are non-infringing prior art. It asserts that it publicly disclosed the allegedly infringing Bravo goggles in the United Kingdom before the '098 patent was issued. It acknowledges that the first time the Bravo goggles were publicly disclosed in the United States was during an early 2010 "Shot Show" after the '098 and '039 patents were issued.

The allegedly infringing Balboa Bravo goggles were introduced into evidence as Exhibit 4. The Bullet Ant goggles and the allegedly infringing Bravo goggles are shown in photo comparisons attached to this Opinion and Order as Exhibits C and D.

## II.   Conclusions of Law and Analysis.

### A.    Balboa's Motion to Dismiss for Lack of Personal Jurisdiction.

Balboa argues that Revision's Complaint must be dismissed under Fed. R. Civ. P. 12(b)(2) because this court lacks personal jurisdiction as Balboa is a California company whose limited activities in Vermont are insufficient to confer general jurisdiction over it. With regard to specific jurisdiction, Balboa seeks dismissal because Revision's claims are unrelated to Balboa's Vermont contacts.

"Federal Circuit law governs the issue of personal jurisdiction in this patent-related case." *Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation,* 297 F.3d 1343, 1348 (Fed. Cir. 2002). "Absent discovery on the issue of personal jurisdiction, [a plaintiff is] required 'only to make a prima facie showing' of jurisdiction to defeat [a defendant's] motion to dismiss." *Medical Solutions, Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1140 (Fed. Cir. 2008) (quoting *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1282 (Fed. Cir. 2005)). "In evaluating this showing, the district court must construe all pleadings and affidavits in the light most favorable to the plaintiff." *Trintec Indus., Inc.*, 395 F.3d at 1282-83.

Under Federal Circuit law, "before a federal court can exercise personal jurisdiction over a defendant in a federal question case, the court must determine whether

7

an applicable statute potentially confers jurisdiction by authorizing service of process on the defendant, and whether the exercise of jurisdiction would satisfy the requirements of due process." *Deprenyl Animal Health, Inc.,* 297 F.3d at 1349.

Fed. R. Civ. P. 4(e) "allows a plaintiff to rely on the state long[-]arm statute of the state in which the federal district court sits to obtain statutory authorization for the exercise of personal jurisdiction." *Id.* at 1350. Because Vermont's "long-arm" statute, 12 V.S.A. § 913(b), permits the exercise of jurisdiction to the full extent of the due process clause, the court need only conduct a due process analysis. *See Northern Aircraft, Inc. v. Reed*, 154 Vt. 36, 40, 572 A.2d 1382, 1385 (1990); *see also Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001).

As this is a federal question case, the due process requirements of the Fifth Amendment rather than the Fourteenth Amendment are at issue. *Id.* at 1350. However, because the Federal Circuit has followed the standard set forth in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny in conducting a Fifth Amendment due process analysis for cases arising under the federal patent laws, the due process analysis remains the same well-established two-pronged test:

> First, the defendant must have "minimum contacts" with the forum. Where a defendant's contacts are continuous and systematic, due process permits the exercise of general jurisdiction. For specific jurisdiction, the "minimum contacts" prong requires the plaintiff to show that the defendant "has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." The second prong of the due process test affords the defendant the opportunity to defeat jurisdiction by presenting a compelling case that other considerations render the exercise of jurisdiction so unreasonable as to violate "fair play and substantial justice."

*Deprenyl Animal Health, Inc.*, 297 F.3d at 1350-51 (internal citations omitted). Here, Revision contends that it has established a prima facie case of both specific and general jurisdiction, although it contends its strongest case is for specific jurisdiction based upon Balboa's offers to sell the allegedly infringing product. The court thus addresses first whether it may assert specific personal jurisdiction over Balboa.

Revision has established, and Balboa concedes that, until this lawsuit was filed, the allegedly infringing Bravo goggles were available for purchase by Vermont residents through Balboa's website, and through Vermont dealers who have the ability to "special order" the item from Balboa. Based upon this evidence, Revision contends that Balboa offered to sell the allegedly infringing Bravo goggles not only generally, but specifically *in Vermont*. Balboa disagrees, arguing that Revision has failed to adduce evidence revealing any intent by Balboa to target Vermont in particular. Moreover, it contends that in the absence of sales of the allegedly infringing product in Vermont (other than a sale to Revision's agent), Revision's claims do not arise out of or relate to Balboa's limited Vermont contacts.

In order to find specific jurisdiction, a court must find that the plaintiff's claim "arise[s] out of or relate[s] to" the activities purposefully directed at the forum state. *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1378 (Fed. Cir. 1998). "Although the nexus necessary to satisfy the 'arise out of or relate to' requirement of the due process inquiry has not been clearly delineated by the Supreme Court," both the Federal Circuit and the Second Circuit "have stated that it is significant that the constitutional catch-phrase is disjunctive in nature, indicating an added flexibility and signaling a relaxation of the applicable standard from a pure 'arise out of' standard." *Inamed*, 249 F.3d at 1362; *see also Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 167 (2d Cir. 2010) (explaining that the "nexus requirement" of specific jurisdiction "merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum").

Assuming a "flexible" and "relaxed" standard for the "arise out of" or "relate to" component of specific jurisdiction, the court must nonetheless grapple with whether Balboa's interactive website and other activities in Vermont establish "minimum contacts." As the Supreme Court observed, the Internet presents "a unique and wholly new medium of worldwide human communication" that has made it possible for businesses to establish and maintain business relationships over great physical distances. *Reno v. ACLU*, 521 U.S. 844, 850 (1997). Moreover, "[u]nlike newspaper, mailing, radio, television, and other media containing advertisements and solicitations, most

9

Internet . . . solicitations are not directed at . . . specific geographic areas or markets; to the contrary, advertising on the Internet targets no one in particular and everyone in particular in any given geographic location." *Millennium Enter., Inc. v. Millennium Music, LP*, 33 F. Supp. 2d 907, 914 (D. Or. 1999). Although courts have now been routinely confronted with the Internet in the context of personal jurisdiction for over a decade, the relationship between a defendant's online activity and its amenability to suit in a foreign jurisdiction often remains ill-defined. *See generally* 4A Wright & Miller, *Federal Practice and Procedure*, § 1073.1 (3d ed. 2011).

Courts generally agree that a defendant may not be "haled into court simply because the defendant owns or operates a website that is accessible in the forum state, even if that site is 'interactive.'" *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010); *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 451, 454 (3rd Cir. 2003) ("the operation of a commercially interactive website accessible in the forum state is insufficient to support specific jurisdiction" and "the mere operation of a commercially interactive web site should not subject the operation to jurisdiction anywhere in the world").

Courts differ, however, regarding which Internet activities constitute conduct "purposefully directed" at the forum state. *Compare See Step Two*, 318 F.3d at 451 ("If a defendant web site operator intentionally targets the site to the forum state, and/or knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied."); *Tristar Products, Inc. v. SAS Group, Inc.*, 2009 WL 3296112, at *3 (D.N.J. Oct. 9, 2009) (finding that the defendant "purposely directed its activities to New Jersey since [its] website includes an online order form that can be transmitted over the internet. The order form includes a drop down menu where customers select their state from a list which includes New Jersey"); *Litmer v. PDQUSA.com*, 326 F. Supp. 2d 952, 958 (N.D. Ind. 2004) (finding that the defendant offered allegedly infringing product for sale in the forum state because it was available to forum residents on the defendant's website); *Multi-Tech Sys., Inc. v. VocalTec Commc'ns, Inc.*, 122 F. Supp. 2d 1046, 1050-51 (D. Minn. 2000) (despite no evidence of

10

"knowing and repeated transmissions . . . from [the defendant's] website to Minnesota residents," the defendant "purposely availed itself for engagement in commercial activities with residents of Minnesota by including a state directory drop box listing Minnesota" on its website); *with High Maint. Bitch, LLC v. Uptown Dog Club, Inc.*, 2007 WL 3046265, at *3 (W.D. Wash. Oct. 17, 2007) ("Although Washington residents are allowed to purchase Uptown Dog products through the website, this does not establish that Uptown Dog has 'purposefully directed' its activity to Washington residents."); *Xactware, Inc. v. Symbility Solution Inc.*, 402 F. Supp. 2d 1359, 1364 (D. Utah 2005) (rejecting the plaintiff's argument that the availability of the patent-infringing product for purchase on the defendant's website established minimum contacts for specific jurisdiction); *Shamsuddin v. Vitamin Research Products*, 346 F. Supp. 2d 804, 808-10 (D. Md. 2004) (offering the infringing product for sale online, and using website to sell the infringing product to two forum residents, "do[es] not evince purposeful availment"); *Swarovski Optik North America Ltd. v. Euro Optics, Inc.*, 2003 WL 22014581, at *7 (D.R.I. Aug. 25, 2003) ("Euro Optics did not purposefully avail itself of conducting business in this forum. . . . The fact that Rhode Island residents 'can' order products from the [defendant's web] site, without more, is insufficient to establish purposeful availment.").

The Federal Circuit, while recognizing the split of authority, has not decided whether "the availability and use of a highly interactive, transaction-oriented website . . . by itself may support long-arm jurisdiction where the site is available to potential customers for the purpose of doing business." *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005). It has made clear, however, that it is not just a defendant's website but its other related activities in the forum state which may provide the basis for specific jurisdiction. *See Id.* ("We need not decide that question here, however, since Trintec does not rely solely on Pedre's website as the basis for jurisdiction."). The Second and Third Circuits have adopted a similar approach, looking beyond a defendant's commercial, interactive website to determine whether the court can exercise specific jurisdiction.

11

For example, in *Chloé*, the plaintiff brought suit in New York alleging trademark infringement arising out of the sale of counterfeit handbags. In dismissing the case for lack of personal jurisdiction, the district court found that the defendant's website sales of fifty-two handbags shipped to New York consumers were not relevant because none of the sales were of fake Chloé handbags. The district court explained that such sales showed purposeful availment of New York for "*some* business activity," but not for "the purpose of selling Chloé handbags—the only activity upon which Plaintiffs' complaint is based[.]" *Chloé*, 616 F.3d at 167. The Second Circuit reversed, finding that the sales of other handbags were "related to" Chloé's trademark infringement claim because, in combination with the defendant's website on which counterfeit Chloé handbags were offered for sale, they demonstrated "a larger business plan purposefully directed at New York consumers" of which the sale of Chloé bags were a part. *Id.*

The Second Circuit further observed that while there was evidence that the defendant had either shipped or was responsible for the shipment of a single counterfeit handbag to one of the plaintiff's agents in New York, such evidence was not dispositive to a specific jurisdiction analysis. *Id.* at 165. As Balboa relies heavily on the purported lack of website sales of the allegedly infringing goggles to Vermont residents (other than to Revision's agent), the scant weight which the Second Circuit accords this evidence is instructive:

> We recognize that there is some dispute regarding the question of whether a sale of a counterfeit item to a plaintiff's investigator or agent by itself constitutes an act of trademark infringement. Indeed, this question is what consumed much of the district court's initial opinion. We also recognize that our Court has not yet determined how so-called "manufactured contacts" ought to be treated for purposes of trademark infringement claims. Nevertheless, because our holding in the instant case is that an employee's single act of shipping a bag—*any* bag, not necessarily a counterfeit one—into the State of New York combined with the employer's other business activity involving the State of New York, gives rise to an inference that the defendant "purposefully avail[ed himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," we leave for another day the question of

> whether the 'single act' of shipping the counterfeit bag to an agent of the
> plaintiff, by itself, constitutes an act of trademark infringement.

*Chloé*, 616 F.3d at 166 n.4 (internal citations omitted).  *Chloé* thus stands for the

proposition that a court must look beyond the sale of the allegedly infringing

product into the forum, in deciding the "purposeful availment" question.

Similarly, the Third Circuit noted in *Step Two* that in cases where a claim of

specific jurisdiction is grounded upon an interactive website, "[c]ourts have repeatedly

recognized that there must be 'something more' ... to demonstrate that the defendant

*directed its activity towards the forum state*." *Step Two*, 318 F.3d at 453 (citation

omitted).[2]  "In deciding whether to exercise jurisdiction over a cause of action arising

from a defendant's operation of a web site, [the Third Circuit held that] a court may

consider the defendant's related non-Internet activities as part of the 'purposeful

availment' calculus." *Id.* at 453.  The Third Circuit thus concluded that, in the absence of

other activities in the forum, a Spanish corporation that operated websites in Spanish, that

offered prices in foreign currencies, that had a contact number only in Spain, and

permitted shipping of its products only to addresses within Spain, and which had no U.S.

sales other than the two generated by the plaintiff which were shipped to an address in

Madrid, did not satisfy the "something more" requirement for specific jurisdiction.

Here, the facts are analogous to those at issue in *Chloé*, and distinguishable from

those at issue in *Step Two* although both decisions instruct the court to look beyond the

website sale of an allegedly infringing product.

---

[2]  The Third Circuit identified the Fourth, Ninth, and Sixth Circuits as adopting a similar
approach. *See Step Two*, 318 F.3d at 452-43 (citing *ALS Scan v. Digital Service Consultants,
Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) (adopting an "intentionality" requirement which required
a court to consider, among other things, a defendant's "manifested intent of engaging in business
or other interactions within the State"); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th
Cir. 1997) (finding that there must be "'something more' [beyond the mere posting of a passive
website] to indicate that the defendant purposefully (albeit electronically) directed his activity in
a substantial way to the forum state"); *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883,
890 (6th Cir. 2002) (holding that the purposeful availment requirement is satisfied "if the web
site is interactive to a degree that reveals specifically intended interaction with residents of the
state")).

Like the plaintiff in *Chloé*, Revision has proffered evidence that Balboa not only offered the allegedly infringing product for sale on its website in a manner which permitted its sale and expected delivery to a Vermont resident (albeit to Revision's agent), but has demonstrated "something more" in Vermont that reflects Balboa's purposeful direction of business activities towards the forum. These activities include Balboa's (1) direct website and non-website sale and shipment of approximately ninety-nine eyewear products to Vermont residents over an approximate three year period; (2) website links that lead to twenty-seven dealers who offer Balboa's products for sale in Vermont; (3) sales of Balboa eyewear products through Vermont dealers in undetermined amounts; and (4) authorization to Vermont dealers to "special order" for sale in Vermont any Balboa product, including the allegedly infringing Bravo goggles.

Examining the aggregate of Balboa's activities in Vermont, *see Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate whether the exercise of jurisdiction would be proper.") (internal quotation marks omitted), and regarding them in the light most favorable to Revision, the court concludes that Revision has established that Balboa purposefully directed its business activities to the State of Vermont and its residents. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1126-27 (W.D.Pa. 1997) ("When a defendant makes a conscious choice to conduct business with the residents of a forum state, "it has clear notice that it is subject to suit there" . . . . If [the defendant] had not wanted to be amendable to jurisdiction in [the forum state], it could have chosen not to sell its [products] to [forum] residents.") (citation omitted). The court also concludes that, following *Chloé*, Revision's design infringement claims "arise out of" or "relate" to Balboa's activities in Vermont as the alleged infringing product is not only offered for sale there, but is part of a larger business plan to do business in Vermont.

Having found "minimum contacts" sufficient for specific jurisdiction, the court must next determine whether Balboa has made a "compelling case" that it would be

unreasonable for this court to assert personal jurisdiction over it. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). The Federal Circuit has explained that this third factor applies only "sparingly," and that its application to defeat an otherwise proper assertion of jurisdiction is "limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010) (internal citation and quotation marks omitted); *see also Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996) ("dismissals resulting from the application of the reasonableness test should be few and far between").

The Supreme Court has identified five factors a court must evaluate to determine whether an exercise of jurisdiction is reasonable: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *See Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 113-14 (1987).

Here, Balboa claims that it would be burdensome for it to litigate in Vermont as all of its personnel, documents, and operations are in California. The Second Circuit has found that "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because 'the conveniences of modern communication and transportation ease that which would have been a serious burden only a few decades ago.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-30 (2d Cir. 2002) (citation omitted). Accordingly, the court finds that the first "reasonableness" factor weighs in favor of Balboa, but only slightly.

All other factors favor litigation of this case in Vermont or are in equipoise.

15

Although Balboa argues that Vermont has no interest at stake in this lawsuit because the patents' owner, Revision Military, Inc., is a Canadian corporation, this ignores the fact that the exclusive licensee of the patents, Revision Military, Ltd., maintains its principal place of business in Vermont, and manufactures its products there. Vermont thus retains an interest in protecting Revision's business interests. *See Real Good Toys, Inc. v. XL Machine Ltd.*, 163 F. Supp. 2d 421, 426 (D. Vt. 2001). Correspondingly, Revision's interest in receiving convenient and effective relief in its chosen forum is furthered by permitting the case to proceed in Vermont. The final factors—the interstate judicial system's interest in obtaining an efficient resolution of this action and the common interest of the several states in promoting substantive social policies—are in equipoise as neither party has identified any efficiency or social policy that would be furthered by either permitting or prohibiting this case to go forward in Vermont. *See Metropolitan Life*, 84 F.3d at 575.

Examining the totality of the "reasonableness factors," the court finds that Balboa has failed to establish that this is a "rare situation" in which asserting personal jurisdiction would be unreasonable despite Balboa's minimum contacts with Vermont.

Having concluded that Revision has demonstrated a prima facie case of specific jurisdiction, the court need not address whether general jurisdiction can also be exercised. Balboa's motion to dismiss for lack of personal jurisdiction is hereby DENIED.

**B.    Balboa's Motion to Dismiss for Improper Venue & Motion to Transfer.**

Because the court has found personal jurisdiction, Balboa's motion to dismiss for improper venue must be denied as "the venue point is a non-issue. Venue in a patent action against a corporate defendant exists wherever there is personal jurisdiction." *Trintec Industries, Inc.*, 395 F.3d at 1280; s*ee also* 28 U.S.C. § 1391(c). The court thus turns to Balboa's request for a transfer to the Southern District of California.

A "district court may transfer any civil action to any other district . . . where it might have been brought" for "the convenience of parties and witnesses." 28 U.S.C. § 1404(a). District courts have the discretion "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart*

*Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The burden is on the defendant to make a "clear and convincing showing" that transfer is warranted. *Habrout v. City of New York*, 143 F. Supp. 2d 399, 401 (S.D.N.Y. 2001).

> In exercising its discretion, the court is guided by a number of factors:
>
> (1) convenience of parties; (2) convenience of witnesses; (3) relative means of parties; (4) locus of operative facts and relative ease of access to sources of proof; (5) attendance of witnesses; (6) weight accorded the plaintiff's choice of forum; (7) calendar congestion; (8) desirability of having the case tried by forum familiar with substantive law to be applied; (9) practical difficulties; and (10) how best to serve the interest of justice, based on assessment of the totality of material circumstances.

*Country Home Products, Inc. v. Schiller-Pfeiffer, Inc.*, 350 F. Supp. 2d 561, 570 (D. Vt. 2004) (citation omitted).

Here, Balboa does not invoke the "relative means of the parties," or the "desirability" of a forum with particularized substantive knowledge, as grounds for transfer. Both parties identify witnesses and other evidence located in or near their preferred forum. Balboa asserts that its witnesses "are located in or [are] available in the Southern District of California," and that "all books, records and documents relevant to the accused product are located in the Southern District of California," (Doc. 11 at 12.) Correspondingly, Revision identifies a number of its witnesses who are located in either Burlington or nearby Montreal, and claims that its "documentary evidence relating to the development of the patented inventions and the marketing and sales of the products covered by the patents is all located in Vermont or Montreal." (Doc. 18 at 11.) Accordingly, the convenience of the parties and witnesses (including witness availability), the ease of access to sources of proof, and general practicality, are essentially neutral factors.

The remaining factors favor Vermont as the appropriate forum. Revision's choice of Vermont is entitled to significant deference because Revision Military, Ltd. is located in Vermont, and Vermont has a legitimate stake in the outcome of this case. *See Country*

17

*Home Products*, 350 F. Supp. at 570-71; *Royal & Sunalliance v. British Airways*, 167 F. Supp. 2d 573, 576 (S.D.N.Y. 2001) ("A plaintiff's choice of venue is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer."). In addition, this court should be able to resolve this matter expeditiously, given its relatively "modest caseload" and the fact that it is already familiar with many of the pertinent factual and legal issues. *Country Home Products*, 350 F. Supp. at 570. In contrast, Balboa has proffered no evidence regarding the relative congestion of its proposed transferee court's docket.

In the absence of clear and convincing evidence that fairness and convenience militate that this case be heard in the Southern District of California, Balboa's motion to transfer must be DENIED.

### C.    Revision's Motion for a Preliminary Injunction.

Pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65, Revision asks the court to enjoin Balboa from marketing or selling its Bravo goggles that allegedly infringe Revision's '098 and '039 patents. Revision claims that the ongoing alleged infringement of its patents is causing it irreparable harm for which there is no adequate remedy at law as it is eroding its military customer base and good will with a "knock off" product at a lower price. Balboa opposes the motion, denying infringement and arguing that Revision cannot demonstrate either a likelihood of success on the merits or irreparable harm.

The Federal Circuit, which has exclusive appellate jurisdiction over patent infringement actions, applies the standard for injunctive relief established by the regional circuit in which the action is brought. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 (Fed. Cir. 1998).

In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the Supreme Court articulated the preliminary injunction standard:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

18

*Id.* at 20 (citations omitted).

The Second Circuit requires a party seeking a preliminary injunction to show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Recently, the Second Circuit ruled that the "serious questions" standard remains viable after *Winter*. *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).

Where, as here, a movant seeks an injunction that will alter rather than maintain the status quo, it must demonstrate a "clear or substantial likelihood of success on the merits," *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008), which is a "more rigorous standard." *Rossini v. Republic of Argentina*, 2011 WL 2600404, at *2 (2d Cir. July 1, 2011) (citation omitted).

In order to demonstrate a likelihood of success on the merits, Revision must show that (1) it will likely prove infringement; and (2) its infringement claim will likely withstand challenges to the validity and enforceability of the patents. *See Purdue Pharma LP v. Boehringer Ingelhiem GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001). Where, as here, there is no immediate challenge to the patents' validity and enforceability, the court considers only whether there is a 'clear" or "substantial" likelihood that Revision will prove design patent infringement.

"A design patent is directed to the appearance of an article to manufacture." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993). Pursuant to 35 U.S.C. § 289, a design patent is infringed when, "[w]hoever during the term of a patent for a design, without license of the owner, . . . applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale[.]" "Design patent infringement is a question of fact, to be proven by a preponderance of evidence." *L.A. Gear, Inc.*, 988 F.2d at 1124. It "does not require proof of unfair competition in the marketplace[.]" *Id.* at 1126.

Revision asserts that the ordinary observer would be deceived into confusing the Bullet Ant goggles with the allegedly infringing Bravo goggles because the accused design is substantially the same as the patented designs.  As the Federal Circuit recently observed:

> The starting point for any discussion of the law of design patents is the Supreme Court's decision in *Gorham* [ *Mfg.*] *Co. v. White*, 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 731 (1871).  That case involved a design patent for the handles of tablespoons and forks.  In its analysis of claim infringement, the Court stated that the test of identify of design "must be sameness of appearance, and mere difference of lines in the drawing or sketch . . .  or slight variances in configuration . . .  will not destroy the substantial identity." *Id.* at 526-27.  Identity of appearance, the Court explained, or "sameness of effect upon the eye, is the main test of substantial identity of design"; the two need not be the same "to the eye of an expert," because if that were the test, "[t]here could never be piracy of a patented design, for human ingenuity has never yet produced a design, in all its details, exactly like another, so like, that an expert could not distinguish them." *Id.* at 527.

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008).  The *Gorham* Court articulated the following test for "sameness of appearance":

> "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."

*Gorham Mfg. Co.*, 81 U.S. at 527.  The "deception that arises" must be the "result of the similarities in the overall design, not of similarities in ornamental features in isolation." *Crocs, Inc. v. Int'l Trade Com'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010); *see also Contessa Food Products v. Conagra, Inc.*, 282 F.3d 1370, 1379 (Fed. Cir. 2002) ("all of the ornamental features illustrated in the [patent] figures must be considered in evaluating design patent infringement").

The Federal Circuit has added that "[p]articularly in close cases, [where] it can be difficult to answer the question whether one thing is like another without being given a frame of reference[,] [t]he context in which the claimed and accused designs are

20

compared, i.e., the background prior art, provides such a frame of reference." *Egyptian Goddess, Inc.*, 543 F.3d at 676-77.[3]

In this case, Revision's evidence of "prior art" is decidedly scant. In its motion for a preliminary injunction, it devotes two sentences to this issue: "The BRAVO goggles share many similarities with the '098 patent, including many characteristics that depart from previous goggle designs . . . One such conspicuous departure from the prior art is the plethora of nearly circular holes in the mask in the '098 patent design." (Doc. 2 at 13.) Revision's dearth of evidence of prior art is not problematic because under the ordinary observer test, "the burden of production as to any comparison prior art [is] on the accused infringer[] [because] [t]he accused infringer is the party with the motivation to point out close prior art, and in particular to call to the court's attention the prior art that an ordinary observer is most likely to regard as highlighting the differences between the claimed and accused design." *Egyptian Goddess, Inc.*, 543 F.3d at 678-79.

Balboa's evidence of prior art is not significantly more substantial. It consists of (1) photographs that purport to establish that the allegedly infringing product "became the latest iteration goggle of the goggles Balboa had been selling to the military since 1999," Hussey Declaration Doc. 21-12 at 25; (Doc. 21-08, Exhibit 7); (2) a claim that "[vent] perforations/holes have long been in use by different manufacturers" (Doc. 21 at 6 citing Struebing and Hussey Declarations); and (3) a claim that Balboa publicly disclosed the Bravo goggles before the first Revision patent was issued. The court may quickly dispense with this evidence of prior art.

---

[3]  The courts routinely refer to "prior art" without defining it. Black's Law Dictionary (9th ed. 2009) defines it as follows:

> Knowledge that is publicly known, used by others, or available on the date of the invention to a person of ordinary skill in an art, including what would be obvious from that knowledge.  Prior art includes (1) information in applications for previously patented inventions; (2) information that was published more than one year before a patent application is filed; and (3) information in other patent applications and inventor's certificates filed more than a year before the application is filed.  The U.S. Patent and Trademark Office and courts analyze prior art before deciding the patentability of a comparable invention.

First, the photographs of previous iterations of Bravo goggles do not reflect the distinct design elements of the allegedly infringing Bravo goggles.  Second, although Balboa offers expert opinions from patent attorney, Donn K. Harms, and eyewear designer, Patrick P. Hussey, that the allegedly infringing Bravo goggles are prior art, these opinions are based upon hearsay evidence from Balboa's vice-president Jennifer Struebing that in September of 2009 an unidentified distributor displayed the Bravo goggles at a trade show in the United Kingdom.  In the course of the court's evidentiary hearing, Ms. Struebing acknowledged that she did not personally attend the 2009 trade show and did not have the actual documents that were offered at it but only similar documents distributed in 2010.  The court ruled Ms. Struebing's evidence of the 2009 trade show was inadmissible hearsay.[4]  This, in turn, undercuts the reliability of Balboa's expert opinions regarding prior art.

Finally, Balboa's reliance on the venting as prior art is untenable because it not only concedes that venting is primarily functional, but because it has not demonstrated that the distinct venting on its Bravo goggles may be found in previous iterations of its goggles products.  At this juncture, the court finds that Balboa has not demonstrated that the allegedly infringing Bravo goggles are prior art.

Because this is not a particularly close case,[5] the court does not need prior art as a "frame of reference" to apply the "ordinary observer test" which the Federal Circuit recognizes is the "sole test for determining whether a design patent has been infringed." *Egyptian Goddess, Inc.*, 543 F.3d at 678.  "Under that test . . . infringement will not be found unless the accused article 'embod[ies] the patented design or any colorable imitation thereof.'"  *Id.* (citation omitted).

---

[4] Because the court has ruled that the evidence of the United Kingdom trade show is inadmissible and unreliable hearsay, the court does not reach Revision's argument that public disclosure of the Bravo goggles outside the United States cannot, as a matter of law, constitute prior art.

[5] *See Egyptian Goddess*, 543 F.3d at 678 ("In some instances, the claimed design and the accused design will be sufficiently distinct that it will be clear without more [such as prior art references] that the patentee has not met its burden of proving that the two designs would appear 'substantially the same' to the ordinary observer.").

In applying the ordinary observer test, the court first examines, as it must, the designs set forth in the '098 and '039 patents. *See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993) ("[a] patented design is defined by the drawings in the patent"). The '098 patent describes goggles depicted in the six drawings contained in the '098 patent which is attached to this Opinion and Order as Exhibit A. The '039 patent describes goggles depicted in the six drawings contained in the '039 patent which is attached to this Opinion and Order as Exhibit B. Revision's first and second generation Bullet Ant model goggles, which were introduced into evidence as Exhibits 3 and 5 at the court's hearing, follow the designs claimed in the '098 and '039 patents, respectively.

The court next compares the '098 and '039 patents with the allegedly infringing Bravo goggles. See *L.A. Gear*, 988 F.2d at 1125 (a "design patent analysis requires comparison of the claimed design with the accused articles."). Where, as here, "the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused articles directly; indeed, such comparison may facilitate application" of the ordinary observer test. *Id.* at 1125-26.

The Bullet Ant and Bravo goggles are shown in photo comparisons attached to this Opinion and Order as Exhibits C and D. To the eye of the ordinary observer, they do not clearly reflect the same design. Indeed, the "accused design could not reasonably be viewed as so similar to the claimed design that a purchaser . . . would be deceived by the similarity between the claimed and the accused designs, 'inducing him to purchase one supposing it to be the other.'" *Egyptian Goddess*, 543 F.3d at 683 (quoting *Gorham*, 81 U.S. at 528). Although the court reaches this conclusion by examining the overall design of the goggles and not on an element-by-element basis, it notes that several design features stand out as dissimilar.

First, the shape of the lenses in the Revision Bullet Ant goggles are different from the accused design to the degree that a Revision lens could not fit into the Bravo goggles. The first generation Bullet Ant lenses are smaller, egg-shaped apertures that reflect a more traditional goggle-like and militaristic appearance. The second generation Bullet

23

Ant lenses are larger and curved on both top and bottom. They present a much closer match to the shape of the lenses of the Bravo goggles, however, it remains true that the lens are different shapes and sizes. The lenses of the Bravo goggles are less curved on top and bottom, and provide a more sunglass or ski goggle appearance. The shape and sizes of the lenses provides an immediate visual difference in the overall appearance of the two sets of goggles.

Second, the bridge of the Revision goggles is concave and is crowned by six vents in a 'v' shape with a stylized "R" and star (which is Revision's logo) in the middle of the bridge. [6] In contrast, the bridge of the Bravo goggles protrudes outward, has no vents, and displays the Balboa logo which is a "B." Again, these differences in the two designs are prominent and immediately apparent to even a casual observer and contribute significantly to the overall appearance of the two products.

Third, both sets of goggles have venting along the top and bottoms which is concededly at least partly a functional aspect of the design as it allows air flow, and prevents moisture and fogging. On the top of the '098 Revision Bullet Ant goggles, the vents are hexagonal in shape and are located in approximately two staggered rows which gives the vents a randomly placed appearance. The '039 Revision Bullet Ant goggles have approximately one and a half rows of these hexagonal vents along the top in an evenly spaced continuous row of vents with a partial row of vents near the goggles' frame. For both sets of Revision goggles, the venting is depressed only slightly as it approaches the bridge of the goggles. In contrast, the venting on the Bravo goggles is circular, has a randomly placed appearance, occupies two to three rows, is wider than either of the two Revision Bullet Ant vent designs, and dips significantly when it approaches the bridge of the goggles.

---

[6] Revision argues that the stylized bridge of the Bullet Ant goggles bearing its logo should be given only minimum weight, because the issue here is deception of overall appearance, not the source or brand of the product. *See L.A. Gear*, 988 F.2d at 1117 (explaining that "[d]esign patent infringement . . . does not . . . allow avoidance of infringement by labeling"). Nonetheless, Revision concedes that its logo's placement and appearance is part of the style claimed in the patented designs.

Viewing the venting on the undersides of the goggles, the hexagonal shaped venting on the Revision Bullet Ant goggles occupies a triangular space while the circular venting on the Balboa Bravo goggles occupies an oblong space.  From this vantage point alone, an ordinary observer could see a marked difference between the claimed designs and the allegedly infringing product.

Given these differences and their impact on the overall appearance of the patented designs and the accused product, Revision has not met its burden of proffering "clear" and "substantial" evidence that it will likely prove design patent infringement under the ordinary observer test.  Because a plaintiff must show a likelihood of success on the merits before a preliminary injunction can be ordered, Revision's motion is DENIED, and there is no need to address other elements of the preliminary injunction analysis.  *See Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555-56 (Fed. Cir. 1994) ("a movant must establish both a likelihood of success on the merits and irreparable harm . . ., the district court may deny a preliminary injunction based on the movant's failure to establish either of these two crucial factors without making findings respecting other factors.").

### III.   Conclusion.

For the reasons set forth above, Balboa's motions to dismiss (Doc. 11) and to transfer venue (Doc. 11) are DENIED, and Revision's motion for a preliminary injunction (Doc. 2) is DENIED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 31st day of August, 2011.

Christina Reiss, Chief Judge
United States District Court

25